**REL:12/12/2014**

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

OCTOBER TERM, 2014-2015

————————————

1131216

————————————

**Ex parte WMS, LLC, et al.**

PETITION FOR WRIT OF MANDAMUS

(In re: Keri Donald Simms

v.

WMS, LLC, et al.)

(Chambers Circuit Court, CV-13-900050)

MOORE, Chief Justice.

William Mudd, John Whitaker, Phillip Luke, and David Wells, and the law firm in which they were members, Whitaker,

Mudd, Simms, Luke, & Wells, LLC ("WMSLW") (hereinafter referred to collectively as "the defendants"),[1] petition this Court for a writ of mandamus directing the Chambers Circuit Court either to dismiss this case for lack of subject-matter jurisdiction based on improper venue or to transfer the case from Chambers County to Jefferson County based on venue being improper in Chambers County or on the doctrine of <u>forum non conveniens</u>. We grant the petition and direct the Chambers Circuit Court to transfer the case to the Jefferson Circuit Court because, for the reasons discussed below, venue is not proper in Chambers County. Because of our disposition of this petition, we pretermit a discussion of the subject-matter-jurisdiction argument and the <u>forum non conveniens</u> argument.

<u>Facts and Procedural History</u>

Keri Donald Simms is a resident of Jefferson County and a practicing attorney in Birmingham, where all the law firms named as petitioners either have been located or were created. Effective May 10, 2012, Simms either resigned from WMSLW or

---

[1]Also named as petitioners are the former law firm of which some of the individual defendants were members, WMS, LLC, and the current law firm, now known as Whitaker, Mudd, Luke, & Wells, LLC, referred to by the defendants as WMLW, LLC.

2

his membership in the limited-liability company was terminated by the other members of WMSLW.[2] Before Simms's departure, WMSLW had been suffering financial troubles. Some of the members of WMSLW had been arguing over their respective capital accounts and discussing a possible merger with another law firm. Simms alleges that, at unspecified times before his departure, the individual defendants had been making secret payments to themselves, above the amounts they were due under their membership arrangement. He alleges that the defendants prepared faulty income statements, concealed from him the true liabilities and debts of WMSLW, concealed from him the details of the proposed merger,[3] and refused to provide him with copies of WMSLW's state and federal tax returns.

After Simms's departure from the firm, in letters dated May 10, 2012, WMSLW offered Simms's clients the option to remain with WMSLW or to continue with Simms as their attorney

---

[2]The parties present differing accounts about whether Simms resigned or was forced out of the limited-liability company. Simms's complaint refers at one point to a "forced buy out" of his membership interest.

[3]An e-mail from Simms to the defendants dated December 11, 2009, stated that Simms was "in the dark on the details of the merger" and asked if "someone [could] bring me [Simms] up to speed."

at his new place of employment, Webster, Henry, Lyons, White, Bradwell & Black, P.C. ("WHLWBB"), another Alabama law firm. Simms alleges that his relationship with the defendants began to deteriorate when an unspecified number of his clients informed WMSLW of their intent to remain clients of Simms and not of WMSLW. He says that he enlisted the services of the Alabama State Bar to force the defendants to release his clients' case files to him. According to Simms, between May 14, 2012, and May 17, 2012, WMSLW[4] mailed to him the files of his clients who opted to stay with him.

One of Simms's clients is his cousin, Angie Smith of Georgia, who had suffered burn injuries in an accident in Georgia on July 23, 2011; Smith's injuries were the subject of litigation in Georgia pending at the time of Simms's departure from WMSLW. Smith had been consulting with Simms since her accident and became a client of WMSLW, by contract, on September 7, 2011. Simms was her attorney at WMSLW. In July 2011, Simms discussed Smith's case with his friend Claud E. "Skip" McCoy, Jr., while the two men were at a wedding in

_____

[4]We recognize that the name of the law firm changed at some point after Simms's departure. However, for ease of reference, we continue to refer to WMSLW.

Chambers County, Alabama. McCoy, a resident of Chambers County who is licensed to practice law in both Georgia and Alabama, agreed to assist Simms with the case as cocounsel. McCoy helped Simms retain the Georgia law firm of Pope, McGlamry, Kilpatrick, Morrison & Norwood, P.C. ("PMKMN"), with which McCoy and Simms (on behalf of WMSLW) entered into a fee-sharing agreement.

Simms was working with McCoy and PMKMN on Smith's litigation at the time of his departure from WMSLW. He alleges that WMSLW never mailed Smith the May 10, 2012, letter informing her of her option to remain with WMSLW or to continue with Simms at WHLWBB. Smith and her husband Charles Smith claim in an affidavit that, "[h]ad we been provided an ethical client notification letter or communication from anyone associated with [WMSLW], including Defendant Wells, we would have immediately terminated that entity" as Smith's legal counsel. Smith's file was one of those turned over to Simms between May 14, 2012, and May 17, 2012.

WMSLW operated as a limited-liability company in which each member contributed income based on the operating agreement of WMSLW. Each member of WMSLW not only received

draws, which were based on the revenue he or she generated for WMSLW, but also served as a guarantor on a line of credit financed by ServisFirst Bank and available to WMSLW. Simms's departure involved a dispute over $146,834, a figure representing the negative balance in Simms's capital account with WMSLW.[5] On May 11, 2012, Wells e-mailed Simms to say that "we [the individual defendants] have no objection to your guarantee being released and we will work with the bank on this." By May 25, 2012, however, Wells had reversed course, stating that WMSLW was not willing to release Simms from his guarantee on the line of credit with ServisFirst Bank until he made a financial contribution toward the line of credit in an amount roughly equal to $146,834, the negative balance of his capital account. The defendants allegedly informed Simms that, in exchange for this contribution, they would release him as a guarantor on the line of credit with ServisFirst Bank. In an e-mail dated July 27, 2012, Wells averred that the defendants had initially been amenable to releasing Simms as a guarantor

---

[5]Only one of the individual defendants, Mudd, had a positive balance. His capital account consisted of $60,238. Whitaker's capital account consisted of a negative balance of $54,162; Luke's consisted of a negative balance of $50,442; and Wells's consisted of a negative balance of $4,456.

until they discovered some unspecified deception on Simms's part regarding fees owed to WMSLW.

The individual defendants and Simms discussed a variety of payment-plan options for Simms, who, according to the defendants, agreed that he and WHLWBB would transfer to WMSLW a percentage of the contingency fee Simms earned from the litigation involving Smith.[6] The defendants allege that, despite entering into this agreement with them, Simms instructed PMKMN to pay the contingency fee from the Smith litigation directly to Simms rather than to WMSLW and that Simms, once he received the Smith contingency fee, refused to transfer that fee to WMSLW. Simms alleges that, in fact, WMSLW was not entitled to any of the Smith contingency fee because, he argues, WMSLW had, by contract, discharged the Smith case to Simms or, alternatively, WMSLW had abandoned the file when it turned it over to Simms between May 14, 2012, and May 17, 2012. It is undisputed that the amount of the Smith contingency fee is $54,000, the result of a $600,000 settlement of a portion of Smith's litigation in Georgia. The

---

[6]Because no evidence of this agreement appears in the record, this Court cannot verify its existence.

7

defendants became aware of the Smith contingency fee when McCoy and attorneys at PMKMN inadvertently e-mailed Simms at his former WMSLW e-mail address regarding the $600,000 settlement.

After receiving this inadvertent e-mail from McCoy and attorneys at PMKMN, the defendants contacted PMKMN by telephone in June 2012 regarding the Smith contingency fee. A member of PMKMN followed up with the defendants by e-mail on June 22, 2012, stating that PMKMN had been previously unaware of any disagreement between Simms and WMSLW regarding the Smith case but that the Smith contingency fee had been deposited in PMKMN's trust account pending resolution of the dispute between Simms and WMSLW. Smith contacted WMSLW by letter dated June 26, 2012, indicating that she was terminating her relationship with WMSLW because she wanted Simms to continue representing her.[7] Simms contends that this June 26, 2012, letter was Smith's first opportunity to declare

---

[7]Simms alleges that, to create a situation in which WMSLW could benefit financially from the Smith litigation, WMSLW deliberately failed to mail Smith the May 10, 2012, letter allowing clients to choose to remain with WMSLW or to continue with Simms at WHLWBB.

her intent to remain Simms's client and to terminate her relationship with WMSLW.

On May 1, 2013, Simms sued the defendants in the Chambers Circuit Court, alleging defamation, libel, oppression of a minority shareholder, misrepresentation, the tort of outrage, deceit, fraud, tortious interference with business relationships, breach of contract, and accounting irregularities. He sought declaratory and injunctive relief and requested the appointment of a receiver, an accounting, or a dissolution of the limited-liability company. On May 12, 2014, he amended his complaint to add a count alleging civil conspiracy and to dismiss his requests for injunctive relief, an accounting, and a dissolution. On June 4, 2013, the defendants moved to dismiss the case for lack of subject-matter jurisdiction and improper venue or, in the alternative, to transfer the case to Jefferson County, where, they said, venue was proper. The defendants also moved to strike the amended complaint, arguing that the original complaint, not the amended complaint, controlled the disposition of the motion to dismiss. On May 14, 2014, the trial court held a hearing on the pending motions and denied the motion for a

1131216

change of venue. The defendants now petition this Court for a writ of mandamus directing the Chambers Circuit Court to dismiss the case or to transfer it from Chambers County to Jefferson County.

## Standard of Review

> "'The proper method for obtaining review of a denial of a motion for a change of venue in a civil action is to petition for the writ of mandamus.' Ex parte Alabama Great Southern R.R., 788 So. 2d 886, 888 (Ala. 2000). 'Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.' Ex parte Integon Corp., 672 So. 2d 497, 499 (Ala. 1995). Moreover, our review is limited to those facts that were before the trial court. Ex parte National Sec. Ins. Co., 727 So. 2d 788, 789 (Ala. 1998).
>
> "'The burden of proving improper venue is on the party raising the issue and on review of an order transferring or refusing to transfer, a writ of mandamus will not be granted unless there is a clear showing of error on the part of the trial judge.' Ex parte Finance America Corp., 507 So. 2d 458, 460 (Ala. 1987). In addition, this Court is bound by the record, and it cannot consider a statement or evidence in a party's brief that was not before the trial court. Ex parte American Res. Ins. Co., 663 So. 2d 932, 936 (Ala. 1995)."

Ex parte Pike Fabrication, Inc., 859 So. 2d 1089, 1091 (Ala. 2002). We further note that, "[w]hen ruling on a motion to

10

transfer, the trial court must determine whether venue was proper at the time the action was filed," Ex parte Canady, 563 So. 2d 1024, 1025 (Ala. 1990), and that, "[i]f venue is not proper at the commencement of an action, then, upon motion of the defendant, the action must be transferred to a court where venue would be proper." Ex parte Overstreet, 748 So. 2d 194, 196 (Ala. 1999).

## Discussion

This case does not involve the merits of Simms's complaint against the defendants. It involves only one issue: Whether venue in Chambers County is proper. The defendants are four individuals and WMSLW, a limited-liability company ("LLC"). In Alabama the proper venue for an action against an LLC and its members is governed by § 6-3-2, Ala. Code 1975, which governs lawsuits against individual defendants. Ex parte Miller, Hamilton, Snider & Odom, LLC, 942 So. 2d 334, 336-38 (Ala. 2006)(holding that the defendant law firm, an LLC, was a partnership for purposes of venue and was governed by § 6-3-2(a)(3)); Ex parte Burr & Forman, LLP, 5 So. 3d 557, 565 (Ala. 2008)("The statute governing venue for individuals, § 6-3-2, Ala. Code 1975, also governs venue for partnerships. For

1131216

purposes of venue, a partnership is deemed to reside where its partners reside."). Therefore, venue in the present case is governed by § 6-3-2(a), which provides:

"(a) In proceedings of a legal nature against individuals:

"(1) All actions for the recovery of land, of the possession thereof or for a trespass thereto must be commenced in the county where the land or a material part thereof lies.

"(2) All actions on contracts, except as may be otherwise provided, must be commenced in the county in which the defendant or one of the defendants resides if such defendant has within the state a permanent residence.

"(3) All other personal actions, if the defendant or one of the defendants has within the state a permanent residence, may be commenced in the county of such residence or in the county in which the act or omission complained of may have been done or may have occurred."

(Emphasis added.) Accordingly, venue is proper in Chambers County only if one of the individual defendants resides in Chambers County or any of the acts or omissions of which Simms complains occurred in Chambers County. It is undisputed that each of the individual defendants resides in Jefferson County, not Chambers County; therefore, we must determine whether the

12

parties' briefs and the materials before us reveal any act or omission in Chambers County that would give rise to venue there.

Although Simms was raised in Chambers County and has family there, he is not a resident of Chambers County. McCoy, who is not a party to this lawsuit, is a resident of Chambers County. In August 2011 Simms and McCoy attended a wedding in Chambers County at which they agreed to jointly represent Smith. The Smith litigation took place in Troup County, Georgia, which is adjacent to Chambers County; however, that litigation took place entirely in Georgia. Simms alleged in his original complaint that the defendants conveyed intentionally false information to McCoy in Chambers County. The record indicates that this allegedly false communication appeared in an e-mail from Mudd to McCoy dated January 18, 2013, concerning the Smith case, Simms's departure from WMSLW, and the contingency fee being held in PMKMN's trust account. There is no evidence indicating that McCoy received this e-mail while in Chambers County.

Simms insists that Chambers County is "the purposeful climatic [sic] place of defendants' tortious conduct targeted

13

against Simms," but the only discernible evidence for this claim is the January 18, 2013, e-mail from Mudd to McCoy, who may or may not have opened the e-mail in Chambers County. There is no showing that this allegedly defamatory e-mail was ever opened in Chambers County or that any injury resulting from it occurred in Chambers County. Even if Simms had shown that the e-mail was opened in Chambers County, venue still would not be proper there because "an individual who makes an allegedly defamatory statement should be sued where the defamatory remark was made," not where a recipient possibly opened an e-mail or otherwise received the defamatory remark. Ex parte Windom, 840 So. 2d 885, 889 (Ala. 2002).

Although Simms suggests that the defendants intended "to use the [Smith] case as a means to an end in Chambers County and [to] conceal the secret payments made among them while Simms was a minority member of [WMSLW]"; that the defendants "chose Chambers County and Simms' personal attachment to the Smith case as the final location of their means to attempt to keep secret their accounting irregularities and payments made among them while Smith was a minority member of [WMSLW]"; and that the defendants "used Chambers County and the Smith case

14

to extract the most harm to Simms," "to claim all of the disputed fee" from the Smith settlement, "to interfere with Simms' economic interest in the fee," "to damage his profession[al] reputation related to the case," and "to use the one case [to which] he had the most emotional attachment, his family's case, to distract him in hopes he would not discover the self-dealing secret payments," there is no evidence showing that the defendants acted in Chambers County. Simms's general claims about the defendants' intent to "use" Chambers County are not substantiated by any particular evidence indicating that the defendants ever carried out their alleged intent. Simms contends that McCoy and the Smith family possess "documentary evidence in Chambers County and [in] nearby LaGrange, Georgia," but no such evidence appears in the petition, briefs, or materials before us. Nor do the parties specifically or unambiguously name, describe, or identify that evidence.

Simms has not proffered evidence of a nexus with Chambers County that would justify his filing this lawsuit there. The fact that Chambers County and Troup County, Georgia, are contiguous does not satisfy the jurisdictional requirements of

1131216

§ 6-3-2(a) when there is no specific indication that any act or omission occurred within Chambers County. Likewise, the fact that McCoy, a nonparty to the action, might have opened an e-mail within Chambers County will not suffice to establish jurisdiction in Chambers County. The act complained of -- sending the e-mail -- occurred in Jefferson County, from where Mudd sent the e-mail, not in Chambers County, where the e-mail was possibly received. See § 6-3-2(a)(3); Windom, 840 So. 2d at 889.

Because no individual defendant is a resident of Chambers County and no identifiable act or omission occasioning this litigation took place in Chambers County, there is no basis for venue in Chambers County under § 6-3-2(a), and the defendants have a clear legal right to have the case transferred from Chambers County to Jefferson County. Overstreet, 748 So. 2d at 197 (holding that the chosen forum was "not a proper venue for [the] action, and it was, therefore, an abuse of discretion for the trial judge to deny [the] motion for a change of venue"). There being no nameable or observable connection under the law to the venue in which Simms filed his lawsuit, we grant the petition for the writ of

16

mandamus. By doing so, we pretermit any discussion of the defendants' request to transfer the case based on the doctrine of forum non conveniens, see § 6-3-21.1, Ala. Code 1975, because the doctrine of forum non conveniens "has a field of operation only where the action is commenced in a county in which venue is appropriate." Ex parte Townsend, 589 So. 2d 711, 714 (Ala. 1991). Here, the action was commenced in a county in which venue was inappropriate; therefore, the trial court had an imperative duty to transfer the action to Jefferson County, where venue was appropriate. Overstreet, 748 So. 2d at 197. In light of the foregoing, we direct the trial court to transfer the action to Jefferson County.

PETITION GRANTED; WRIT ISSUED.

Stuart, Parker, Shaw, and Wise, JJ., concur.